IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FATIMAH MUHAMMAD,                          )
                                           )
                    Plaintiff,             )          Civil Action No. 08-278
                                           )          Erie
                                           )
        v.                                 )
                                           )
MICHAEL J. ASTRUE, COMMISSIONER            )
OF SOCIAL SECURITY                         )
                    Defendant.             )

Cohill, Senior District Judge.

**MEMORANDUM OPINION**

## I.      Introduction

Pending before this Court is an appeal from the final decision of the Commissioner of Social

Security ("Commissioner"), denying the claims of Fatimah Muhammad ("Plaintiff") for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42

U.S.C. §§1381, *et. seq.* Plaintiff argues that the decision of the Administrative Law Judge ("ALJ")

should be reversed and this matter remanded to the Commissioner either for further consideration

of new and material evidence or for the purpose of awarding benefits to Plaintiff. Specifically,

Plaintiff argues that the ALJ erred when he: (1) failed to reopen the record to consider new and

material evidence that was not available at the time of the hearing and refused to conduct a

supplemental hearing to obtain accurate vocational testimony pursuant to HALLEX 1-2-5-56;[1] and

_____

[1] Section 1-2-5-56 of the SSA's Hearings, Appeals and Litigation Law Manual
("HALLEX") addresses "Obtaining Vocational Expert Opinion After the Hearing."

(2) determined that Plaintiff had the residual functional capacity to perform light or sedentary work. (Docket No. 9 at 9-12).   Defendant argues: (1) the case could not have been reopened, as the allegedly new evidence was not produced by Plaintiff until after the ALJ's decision; (2) this Court may not review evidence that was not before the ALJ because Plaintiff has failed to show good cause or that the evidence in question is material; (3) the Court may not review the determination of the Appeals Council, as it is not the final decision of the Commissioner; and (4) substantial evidence supports the ALJ's determination that Plaintiff had the residual functional capacity to perform work at the light or sedentary exertional level. (Docket No. 13 at 9-18).   Therefore, the Commissioner argues, the ALJ's determination should be affirmed. *Id.*

In consideration of the parties submissions and for the following reasons, the Commissioner's motion for summary judgment, (Docket No. 12), will be GRANTED and Plaintiff's motion for summary judgment, (Docket No. 8), will be DENIED.

## II.    Procedural History

Plaintiff protectively filed for SSI on September 28, 2005, (R. at 104), claiming that she became disabled and unable to work on September 1, 2003 as a result of Hepatitis C, bulging disc in her back, a knot in her lung, stomach pain and hypertension. (R. at 94). Plaintiff's claim was initially denied on January 27, 2006. (R. at 13; 71- 75).  She filed a timely request for a hearing, (R. at 9), which was held before an ALJ on October 10, 2007 in Erie, Pennsylvania. (R. at 13; 25-27). Plaintiff appeared at the hearing with counsel and testified. (R. at 13; 32-43).  At the time of the administrative hearing, Plaintiff was forty-nine years old. (R. at 28).  She testified that she has a high school diploma. (R. at 28).  She also testified that she has past work experience as a cashier, until

2

she was injured at work in 2002. (R. at 33). A vocational expert, Samuel Edelmann, also testified at the hearing. (R. at 44-49). He testified as to the number of available jobs in the national economy that could be performed by an individual with the limitations described to him by the ALJ. (R. at 49).

In his decision dated December 19, 2007, (R. at 13-22), the ALJ determined that Plaintiff is not under a disability within the meaning of the SSA. (R. at 22). In addition to filing a timely request to review the ALJ's decision, Plaintiff sought a re-hearing by the ALJ subsequent to the decision based on additional evidence, including a medical source statement dated October 19, 2007 from Sharon Bruno, M.D., Plaintiff's treating physician. (R. at 5-6). A re-hearing was not granted, but the Appeals Council considered the evidence produced by Plaintiff. (R. at 5). Plaintiff's request for review by the Appeals Council was denied on August 13, 2008. (R. at 5). Plaintiff thereafter filed a Complaint in this Court on October 28, 2008, seeking judicial review of the ALJ's determination. (Docket. No. 3).

Plaintiff filed a motion for summary judgment, (Docket No. 8), and brief in support, (Docket No. 9), on March 11, 2009. The Commissioner filed a cross-motion for summary judgment, (Docket No. 12), and brief in support, (Docket No. 13), on May 11, 2009.

## III.    Plaintiff's Medical Background

### Dr. Bruno

The medical records indicate that Plaintiff was treated by her primary care physician, Dr. Sharon Bruno, M.D. several times in 2004 and 2005. (R. at 260-303). In June 2004, Plaintiff was examined for abdominal pain. (R. at 303). A pelvic ultrasound was performed transabdominally and transvaginally, which revealed unremarkable findings. *Id.* Plaintiff saw Dr. Bruno on November

8, 2004 for follow up of a motor vehicle accident on November 4, 2004. (R. at 277).  Plaintiff stated to Dr. Bruno that she had been hit by a vehicle going roughly seventy-miles an hour on the driver's side of the car in the middle. *Id.* Plaintiff was able to get out of the car, which was drivable. *Id.* Plaintiff reported to Dr. Bruno that she went to the ER and had x-rays of the spine, ribs, chest area, shoulder and pelvis taken. *Id.* These did not show any fractures. *Id.* She was given Vicodin for pain. *Id.* Plaintiff complained to Dr. Bruno that, at the time of the examination, she still had soreness in her lower back, tingling and numbness in her left leg, and soreness in her left shoulder. *Id.* Dr. Bruno noted that Plaintiff was a bit stiff getting on and off the examination table. *Id.* Dr. Bruno's notes also indicate that Plaintiff's chest was clear. *Id.* She had a range of motion as far as her shoulder. *Id.* Dr. Bruno noted no bruising or swelling, but did note tenderness in the left trapezius area and in the anterior part of the pectoral area. *Id.* She also noted tenderness in Plaintiff's low back on the paravertebral area and S1 area. *Id.* A straight leg test was negative and motor strength was equal bilaterally. *Id.*

Dr. Bruno's records state that Plaintiff was given Dolobid, Norflex and Vicodin. *Id.* She noted that Plaintiff complained of lots of tingling and numbness, which Dr. Bruno opined was muscle strain. *Id.* She noted that follow up with nerve conduction studies, x-rays and MRIs would be needed if the tingling persisted. *Id.*

A CT scan of Plaintiff's abdomen and pelvis in November 2004 indicated a small ovarian cyst and cholelithiasis. (R. at 302). Dr. Bruno ordered an image of Plaintiff's lumbosacral spine in regard to back and left side leg pain. (R. at 301). The records indicate that alignment appeared to be normal and disc spaces well-preserved. *Id.* There was no evidence of spondylolysis or spondylolisthesis. *Id.* The image also indicated that gallstones could not be excluded. *Id.*

4

A follow-up examination performed by Dr. Bruno on November 26, 2004 indicates that Plaintiff was unable to take the prescribed Dolobid because it interacted with another of her prescriptions. (R. at 276). Plaintiff reported having a lot of lower back pain and numbness and tingling down the left leg. *Id.* Dr. Bruno prescribed Lodine, refilled Vicodin and prescribed physical therapy. *Id.* She noted that Plaintiff had significant tenderness in the left S1 area and paravertabral area. *Id.* A straight leg lift on the left side was positive and motor strength was weaker on the left than the right, secondary to pain. *Id.*

A chest CT performed in December 2004 indicated a left perihilar nodule measuring 1.3-1.6 cm. (R. at 300). Further evaluation and follow-up were recommended. *Id.*

Plaintiff was referred to NovaCare Physical Therapy by Dr. Bruno in December 2004. (R. at 275). The records from her initial evaluation indicate that Plaintiff presented signs and symptoms consistent with low back and cervical spine pain due to muscle strain. *Id.* She was put on a plan to increase flexion and extension of her spine and improve strength in her shoulder and left hip, to allow Plaintiff to tolerate all lifting activities with ease. *Id.*

Plaintiff was seen by Dr. Bruno on March 8, 2005. (R. at 272). At this visit, Plaintiff complained of elevated blood pressure. *Id.* She indicated to Dr. Bruno that she was seen in the Emergency Room on February 17. *Id.* Dr. Bruno's records also indicate that Plaintiff had a D & C in February and complained that she continued to have pelvic pain and discomfort as well as headaches and dizziness after the procedure. *Id.* Plaintiff reported to Dr. Bruno that she was given Morphine, Toradol and Phenergan at the Emerency room, which relieved her pain a bit. *Id.* She also reported to Dr. Bruno that she was taking Vicodin every four (4) to six (6) hours. *Id.* Plaintiff was given Avalide for her blood pressure and instructed to use Lodine with the Vicodin. *Id.*

5

Dr. Bruno again ordered a MRI of the lumbar spine in March 2005 in regard to leg numbness and back pain. (R. at 298). The MRI indicated a left paramedian disc protrusion at L5-S2 disc. *Id.* The records indicate that this exhibited mass effect and deformed the left ventral contour of the thecal sac and displaced the S1 nerve root. *Id.* The records indicated that the lumbar spine was otherwise unremarkable and the distal cord and conus regions were normal. *Id.* Plaintiff was seen for follow-up with Dr. Bruno on Mach 18, 2005. (R. at 271).  At this visit, Plaintiff indicated that she was not having further chest pain, headaches or dizziness. *Id.*  She reported that her back felt a little better with the addition of Lodine. *Id.* Dr. Bruno recommended follow-up with a neurosurgeon in regard to Plaintiff's disc issue.  She noted that Plaintiff complained of ongoing pelvic discomfort, but with no findings. *Id.*

Plaintiff was seen again for follow-up of her high blood pressure by Dr. Bruno on April 22, 2005. (R. at 267).  Dr. Bruno indicated that Plaintiff reported headaches off and on and abdominal pain off and on. *Id.*  Dr. Bruno opined that pain in the left leg may have been caused by the herniated disc in her back. *Id.* On May 17, 2005, Dr. Bruno saw Plaintiff again for follow-up. (R. at 266).  Dr. Bruno noted that blood work indicated that Plaintiff was anemic and needed to be rechecked. *Id.* At this visit, Plaintiff complained that her right arm was going numb off and on.  Dr. Bruno noted that she would check Plaintiff for carpal tunnel syndrome. *Id.*  She also noted that Plaintiff had a colonoscopy which revealed no unusual findings. *Id.* Plaintiff was referred for a nerve conduction study of her right upper extremity in regard to potential carpal tunnel  in June 2005, which was normal. (R. at 284).

Dr. Bruno saw Plaintiff again on July 19, 2005. (R. at 264).  Plaintiff complained of right hand numbness off and on and pain, particularly when grabbing things. *Id.*  She also complained of

6

constipation, bloating and cramping and off and on abdominal pain. *Id.* Dr. Bruno noted that tests showed no neuropathy in Plaintiff's arm. *Id.* She recommended follow-up with Plaintiff's gynecologist for abdominal pain. *Id.* Plaintiff was prescribed Zelnorm for constipation. *Id.*

An MRI of the cervical spine was performed in August 2005, which was negative. (R. at 297). An MRI of Plaintiff's right thumb was also performed in August 2005, after she complained of pain. (R. at 290). The MRI was negative. *Id.*

Plaintiff was seen again by Dr. Bruno on September 15, 2005. (R. at 262). Dr. Bruno noted that Plaintiff had an injection in her thumb for pain on September 7, which needed follow up. *Id.* She noted that the injection helped a bit with stiffness and soreness. *Id.* She noted tenderness at the base of the thumb and forearm, but not swelling or bruising. *Id.* Dr. Bruno's notes indicate that Plaintiff had wrist tendinitis and that she was following up with an orthopedic surgeon. *Id.* She also noted that Plaintiff would be seeing a chiropractor for her back pain and gave Plaintiff a refill of Lortab. *Id.*

### Specialists and Surgical Procedures

Plaintiff was referred to a number of specialists by Dr. Bruno in regard to her various health issues between 2004 and 2005.

### St. Vincent Surgery Center

Plaintiff underwent a fractional D & C and diagnostic hysteroscopy on February 15, 2005. (R. at 123). The postoperative diagnosis was abnormal uterine bleeding and no other abnormalities were seen. *Id.* On April 25, 2005 Plaintiff was seen by St. Vincent neurological surgery. (R. at 128). Dr. Daniel Muccio, M.D. opined that Plaintiff had back and left leg radicular pain secondary to herniation of the L5-S1 disc on her left side. (R. at 129). Dr. Muccio offered surgical intervention

and informed Plaintiff of the risks, which included the possibility that surgery could worsen her pain. *Id.* Plaintiff indicated to Dr. Muccio that she would take his recommendations under advisement. *Id.* Plaintiff saw Dr. Muccio for follow-up on June 5, 2006. (R. at 402). At that time, Dr. Muccio offered to perform surgery again. *Id.* He noted that he informed Plaintiff that surgery could fail to relieve her pain. *Id.* Plaintiff declined to consider surgery. (R. at 403).

### Dr. McGovern

Plaintiff was referred to Dr. Jeffrey McGovern, M.D. for a review of an abnormal radiograph of her lung. (R. at 140). On December 9, 2004, Dr. McGovern indicated that Plaintiff had a lobulated left upper lobe nodule on a December 7, 2004 x-ray. (R. at 142). Dr. McGovern opined that it was benign. (R. at 144). He further opined that Plaintiff could also have granulomatous disease,[2] but that other vascular abnormalities could not be ruled out. *Id.* He indicated that he would not pursue intervention at that time, but would continue to follow Plaintiff. *Id.*

### Dr. Dexter

Plaintiff was referred to Dr. David Dexter, M.D., a surgeon at Great Lakes Surgical Specialists and was seen on April 5, 2005. (R. at 268). Dr. Dexter examined Plaintiff in regard to her abdominal and pelvic pain. *Id.* On examination of Plaintiff's abdomen, Dr. Dexter noted that it was soft, non-tender, non-distended, with normoactive bowel sounds. (R. at 269). He noted no tenderness or significant curvature of the spine. *Id.* Dr. Dexter opined that Plaintiff had an essentially normal retroperitoneal lymph node size, potentially slightly enlarged as a result of undergoing a D

---

[2]     Granulomatous disease referrs to granuloma (aggregation of inflammatory cells) formation in the lung, which represent a chronic inflammatory presence initiated by either infectious or non-infectious agents. Dorland's Illustrated Medical Dictionary, 31st Ed.814-816 (Saunders, et al., eds. 2007).

&C within a few weeks of a CT scan. *Id*. He recommended no diagnostic measures to evaluate her lymph nodes further. *Id.* He also did not recommend surgical exploration for a cause of the abdominal pain. *Id*.

### Dr. Kiel

Plaintiff was referred to Dr. Robert Kiel, D.O. for complaints of recurrent right lower quadrant pain. (R. at 132). Dr. Kiel performed a colonoscopy, which revealed that the underlying mucosa appeared to be normal. *Id*. He noted edema[3] and mild chronic imflammation and benign lymphoid aggregates of lamina propria.[4] (R. at 134).

On June 28, 2006 Dr. Kiel performed an esophagogastroduodenoscopy with biopsy. (R. at 400). His records indicate that he noted erythema and gastritis involving the antrum and body of the stomach, but no other abnormalities were noted. *Id*.

### Dr. White

Plaintiff was seen by Dr. Barry White, M.D., a neurologist, at the request of Dr. Bruno on May 2, 2006. (R. at 405). Dr. White indicated that Plaintiff complained of intermittent right arm numbness, weakness and paralysis. Id. An MRI of the neck was unremarkable. Id. According to Dr. White, he informed Plaintiff that he was unable to find any evidence of a neurological problem, but that she stated she was experiencing one that no one could find. (R. at 406).

---

[3]      Edema is defined as "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues." Dorland's Illustrated Medical Dictionary, 31st Ed. 600 (Saunders, et al., eds. 2007).

[4]      This refers to an aggregate of small nodules in the thin layers of connective tissues, blood vessels and nerves lying immediately beneath the mucous membranes. Dorland's Illustrated Medical Dictionary, 31st Ed. 1014, 1086 (Saunders, et al., eds. 2007).

### Dr. Kalata

Plaintiff was seen for a consultative examination by Dr. John Kalata, D.O. on December 19, 2005. (R. at 247). Dr. Kalata noted that Plaintiff indicated a history of Hepatitis C and high blood pressure. *Id.* He also noted complaints of back pain and a bulging disc at L5-S1 with radiation down her left leg. *Id.* Plaintiff indicated to Dr. Kalata that she takes two Vicodin daily for pain. *Id.* Plaintiff also indicated to Dr. Kalata that she is regularly checked for an infiltrate in her lung, but there has been no intervention. (R. at 248). She also complained of lower abdominal and pelvic areas. *Id.* Dr. Kalata noted that a sonogram and pap smears did not reveal any significant findings. *Id.* She also complained of right arm numbness. *Id.* Dr. Kalata noted that Plaintiff had several studies done and that her chiropractor, Dr. DeLuca had told her she had a pinched nerve. *Id.*

On physical examination of Plaintiff, Dr. Kalata noted that her lungs were clear. *Id.* He also noted that, neurologically, Plaintiff's cranial nerves appeared to be intact and her reflexes were 2/4 bilaterally. (R. at 251). In regard to Plaintiff's extremities, Dr. Kalata's notes indicate that she was unable to raise her shoulder against resistence of the right shoulder. *Id.* Plaintiff stated that she had a rotator cuff problem. *Id.* She also complained of neuropathy and numbness in her right arm. *Id.* Her grip strength in her right arm was 5/5. *Id.* Dr. Kalata noted that Plaintiff could not toe walk, heel walk or crouch. *Id.* He also noted that her neck and lower back area were tender. *Id.*

Dr. Kalata's notes state that Plaintiff was able to get on and off the examining table normally. She was not able to walk on her heels or toes or squat. He indicated that her motor power, however, appeared to be 5/5 and there was no indication of atrophy. *Id.* He noted that she was able to straight leg raise both seated and supine. *Id.* He noted no wheezing, rales or rhonchi on lung examination. *Id.*

10

In addition to performing a physical examination of Plaintiff, Dr. Kalata completed a medical source statement. The medical source statement indicates that Plaintiff would never be able to crouch and would be able to bend, kneel, stoop, balance and climb occasionally. (R. at 253). Dr. Kalata's assessment further indicated that Plaintiff's reaching would be affected by right shoulder pain and limited motion. *Id.* He likewise indicated that Plaintiff's impairments would affect her ability to work in poor ventilation, near heights, movement and vibration. *Id.*

Dr. Kalata opined that Plaintiff would be able to carry ten (10) pounds occasionally and two (2) to three (3) pounds frequently as a result of right arm numbness and lower backache. (R. at 254). He also opined that Plaintiff would be able to stand and/or walk less than one (1) hour per day as a result of lower backache. *Id.* He indicated no limitations in Plaintiff's ability to sit and limited pushing and pulling in both her upper and lower extremities as a result of right arm numbness and lower backache. *Id.*

## IV.    Standard of Review

The Congress of the United States provides for judicial review of the Commissioner's denial of a social security claimant's application for benefits. 42 U.S.C. §405(g). Pursuant to this mandate, this Court must determine whether or not substantial evidence supports the factual findings of the Commissioner. 42 U.S.C. §405(g). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389 (1971)). This differential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. *Id.*; *Fargnoli v. Massanari*, 247

F.3d 34, 38 (3d Cir. 2001) (reviewing whether the ALJ's findings "are supported by substantial evidence" regardless of whether the court would have decided the factual inquiry differently).

## V.    Discussion

Under Title XVI of the Social Security Act, the term "disability" is defined as the:

inability to engage in any substantial gainful activity by reasons of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months ...

42 U.S.C. §1382(a)(3)(A).  A person is unable to engage in substantial activity when she:

is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. §1382(a)(3)(B).

In determining whether a claimant is disabled under the Social Security Act, the Commissioner applies a five-step sequential evaluation process. 20 C.F.R. §404.1520. *See McCrea v Commissioner of Social Security*, 370 F.3d 357, 360 (3d Cir. 2004).  The evaluation process proceeds as follows. At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to steps two and three. 20 C.F.R. §404.1520(a)(4)(I).  At step two, the Commissioner must determine whether the claimant has a severe impairments, must then determine, at step three, whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., Part 404, Subpt. P, Appdx. 1. 20 C.F.R. §404.1520(a)(4)(iii). If the claimant does not have an impairment or combination of impairments that meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or combination of impairments prevent her from performing her past

12

relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work that exists in the national economy, considering her residual functional capacity, age, education and work experience. 20 C.F.R. §404.1520(a)(4)(v). *See also McCrea*, 380 F.3d at 360; *Sykes v. Apfel*, 228 F.3d 269, 262-63 (3d Cir. 2000).

In this case, the ALJ determined: (1) Plaintiff has not engaged in substantial gainful activity since the date of application; (2) Plaintiff suffers from the following severe impairments: hepatitis C, degenerative disc disease, lung disease, abdominal pain and hypertension; (3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment; (4) Plaintiff has no past relevant work; and (5) considering her residual functional capacity, age, education and experience, Plaintiff can perform work that exists in the national economy. (R. at 15-21).

Plaintiff challenges the ALJ's refusal to re-open the record or conduct a supplemental hearing and his determination at step five of the sequential evaluation process.

A.     *Whether the ALJ Erred in Failing to Re-open the Record to Consider Evidence Not Presented by Plaintiff at the Administrative Hearing.*

Initially, Plaintiff contends that the ALJ erred when he failed to reopen the record to consider new and material evidence that was not available at the time of the hearing and refused to conduct a supplemental hearing to obtain accurate vocational testimony pursuant to HALLEX-I-2-5-56. (Docket No. 9 at 9-10). More specifically, Plaintiff contends that the ALJ erred when he failed to reopen the record to consider a residual functional capacity assessment of Plaintiff completed by her treating physician, Sharon Bruno, M.D., ("Dr. Bruno"), on October 19, 2007 and refused to conduct a supplemental hearing to obtain accurate vocational testimony pursuant to HALLEX I-2-5-

13

56. (R. at 435-38). Alternatively, Plaintiff argues that we should remand this case to the ALJ in the interest of judicial economy. (Docket No. 9 at 12).

1.

Turning first to Plaintiff's argument that the Court should remand this case to the ALJ, we find that Plaintiff has not established that Dr. Bruno's medical source statement constitutes material evidence, or that she has shown good cause why it was not provided to the ALJ prior to his determination. As such, we cannot remand on the basis of said evidence.

The United States Court of Appeals for the Third Circuit has held that if, in a social security appeal to the district court, a claimant proffers evidence not proffered to the ALJ, "then the district court may remand to the Commissioner, but that disposition is governed by Sentence Six of §405" of the Social Security Act. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). According to the sixth sentence of 42 U.S.C. §405(g), this court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Indeed, "evidence first presented to the district court must not only be new and material but also supported by a demonstration by [the] claimant of 'good cause for not having incorporated the material into the administrative record.'" *Matthews*, 239 F.3d at 592-93 (quoting *Szubak v. Secretary of HHS*, 745 F.2d 831, 833 (3d Cir. 1984)).

In order to be considered "new" for purposes of §405(g), evidence must be "new" and "not merely cumulative of what is already in the record." *Szubak*, 745 F.2d at 833 (citation omitted). For evidence to be considered "material," it must be "relevant and probative," meaning there must be a "reasonable possibility that the new evidence would have changed the outcome of the

14

[Commissioner's] determination." *Id.* (citations omitted).

Here, Plaintiff argues that the medical source statement from Dr. Bruno constitutes new and material evidence, insofar as Plaintiff had requested and received treatment records from Dr. Bruno prior to the administrative hearing, but Dr. Bruno did not complete the medical source statement for Plaintiff until October 19, 2007, which was not provided to Plaintiff until December 26, 2007. (Docket No. 9 at 10). First, the Court finds that the medical source statement from Dr. Bruno is not material, as Plaintiff has not shown a reasonable possibility that the evidence would have changed the outcome of the ALJ's determination.

"To secure remand, a claimant must show that new evidence raises a 'reasonable possibility' of reversal sufficient to undermine confidence in the prior decision." *Newhouse v. Heckler*, 753 F.2d 283, 287 (3d Cir. 1985). In order to show a "reasonable possibility" of reversal, a claimant is required to offer "more than a minimal showing" that the a different outcome would be warranted, considering the new evidence. *Id.*

In her medical source statement provided after the ALJ's determination, Dr. Bruno indicated that Plaintiff can occasionally and frequently lift and/or carry less than ten (10) pounds. (R. at 435). She also opined that Plaintiff would be able to stand less than four hours in an eight hour work day as a result of her complaints of pain. (R. at 436). Dr. Bruno indicated that Plaintiff would have no limitations in sitting. *Id.* She noted that Plaintiff would be limited in pushing and pulling in her upper extremities. *Id.* She also noted that Plaintiff is never able to climb, kneel, crouch, crawl or stoop and that she is occasionally able to balance. (R. at 437). Additionally, Plaintiff is occasionally able to reach, handle and finger, but unlimited in her ability to feel. Id. Dr. Bruno opined that Plaintiff is limited in sight, as she wears glasses, but unlimited in hearing and speaking. *Id.* She also opined that

Plaintiff is unlimited in her ability to be exposed to temperature extremes, noise, dust, vibration, humidity/wetness, hazards and fumes, odors chemicals and gases. (R. at 438). Dr. Bruno did not give an opinion as to Plaintiff's medical limitations, *i.e.*, her likeliness to call off work as a result of her impairments, complete a full work day, and her break requirements. *Id.* Rather Dr. Bruno made a note that Plaintiff would need a functional capacity test in order to make this determination. *Id.*

Based on the evidence of record and the ALJ's determination, the Court finds that Plaintiff has not made the requisite showing that a different outcome would be warranted as a result of Dr. Bruno's medical source statement. Here, the ALJ based his adverse determination on diagnostic studies, showing disc protrusion at the L5-A1 and impingement on the anterior thecal sac and S1 nerve root, osteoporosis and disc space narrowing, but no other significant abnormalities of the spine. (R. at 18-19). He also noted that diagnostic studies showed a small ovarian cyst, cholelithiasis and no other abnormal findings. (R. at 19). He noted a benign left pulmonary nodule and no active chest disease. *Id.* He likewise noted a negative right thumb x-ray taken on August 9, 2005. *Id.* The ALJ also relied upon the opinions of Dr. Kalata, indicating that Plaintiff can lift and carry ten (10) pounds occasionally, and two (2) to three (3) pounds regularly; can sit without limitation; with limitations in pushing and pulling in both her upper and lower extremities; can stand or walk for an hour or less; can only occasionally climb, balance, bend, stoop, kneel, squat and crawl, but can never crouch; is impaired in her ability to reach and see; and is affected by poor ventilation, heights, moving, and vibration. *Id.* The ALJ assigned Dr. Kalata's opinion the "appropriate probative weight." *Id.*

The ALJ's determination states that he gave Dr. Bruno's February 16, 2007 analysis "great weight," noting that, in her opinion, while Plaintiff had ongoing neck, shoulder and arm numbness,

16

Plaintiff is not totally disabled. Id. The ALJ specifically noted that it was Dr. Bruno's opinion at this time that Plaintiff would be able to work twenty (20) hours a week based on the fact that there was no nerve involvement in Plaintiff's complaints of pain and numbness. *Id.* The ALJ went on to note that, based on the Plaintiff's testimony and the objective medical evidence provided by Dr. Bruno, he believed that Plaintiff had

> lobbied Dr. Bruno to influence [her] opinion that [Plaintiff] is disabled . ... Dr. Bruno specified a limitation of only 20 hours of work; however, she also stated that she could see no physical limitations and the residual functional capacity assessment alluded to by Dr. Bruno has never been produced by the claimant and the doctor's office manager stated that they do not complete these forms.

(R. at 20).

Considering that the ALJ gave great weight to the objective medical records produced by Dr. Bruno, and found them to be inconsistent with Plaintiff's contention that she is completely disabled, (R. at 20-21), the Court finds that Plaintiff has failed to establish more than a minimal showing that Dr. Bruno's medical source statement would warrant a different outcome. Moreover, the medical source statement eventually provided by Dr. Bruno after the administrative record was closed and the ALJ had rendered his decision is not significantly different in several areas from the assessment provided by Dr. Kalata in December 2005. Indeed, in various areas, Dr. Kalata noted more limitations than Dr. Bruno's medical source statement. Both Dr. Kalata and Dr. Bruno opined that Plaintiff can lift ten (10) pounds occasionally and two (2) to three (3) pounds frequently. (R. at 254; 435). Dr. Kalata's assessment, relied upon by the ALJ, indicated that Plaintiff would be able to stand less than one (1) hour per day, but Dr. Bruno's source statement indicated Plaintiff could stand less than four (4) hours per day. (R. at 254; 436). Both noted that Plaintiff has no limitations as to sitting. *Id.* Dr. Kalata opined that Plaintiff would be limited in her ability to push and pull in both her upper

17

and lower extremities, (R. at 254), while Dr. Bruno opined that she would be limited only in her upper extremities. (R. at 436). As Plaintiff notes, Dr. Kalata's statement and Dr. Bruno's statement differ in regard to Plaintiff's ability to stoop. (R. at 253; 437). Dr. Kalata indicated that Plaintiff would be able to stoop occasionally and Dr. Bruno indicated that Plaintiff would never be able to stoop. *Id.* Insofar as the ALJ had Dr. Bruno's records, as well as her opinion regarding Plaintiff's overall ability to work, in addition to Dr. Kalata's opinions and the records from all of Plaintiff's treating physicians, this alone is not sufficient to show that the Commissioner's determination would have been different, had the ALJ had Dr. Bruno's medical source statement. Therefore, we find that Plaintiff has failed to establish that said statement is material.

Further, even assuming that the medical source statement from Dr. Bruno constitutes new and material evidence, Plaintiff has not established good cause for why she could not have obtained the residual functional capacity assessment from her treating physician prior to the hearing. In order to establish the "good cause" requirement, a claimant must show "some justification for the failure to acquire and present such evidence to the [Commissioner]." *Szubak*, 745 F.2d at 833. Otherwise, the submission of additional evidence could be an "end-run method of appealing an adverse ruling by the [Commissioner]." *Id.* at 834.

Here, Plaintiff has articulated that she was unable to submit Dr. Bruno's medical source statement  before January 8, 2008 because, while she had requested Plaintiff's treatment records from Dr. Bruno, she had not completed a medical source statement by the time of the administrative hearing. (Docket No. 9 at 10). Rather, Plaintiff asserts, Dr. Bruno failed to complete the medical source statement until October 19, 2007 and to provide it to Plaintiff's counsel until December 26, 2007. *Id.* As such, Plaintiff was unable to provide the evidence until after that date. *Id.* Plaintiff

argues that this evidence is necessary, as it is "the most current and up-to-date evidence available, whereas the physical assessment relied upon by the ALJ is from nearly two years prior." *Id.*

First, the Court notes that Plaintiff made no indication, either at the time of the administrative hearing or otherwise, that she was waiting for Dr. Bruno to provide a medical source statement. (R. at 25-50). Nor did Plaintiff's counsel ask that the record remain open in order to obtain further evidence. *Id.* Moreover, the Court finds that the fact that Dr. Bruno did not complete a medical source statement until after the administrative hearing, which was not provided to Plaintiff's counsel or to the Commissioner until after the ALJ's determination does not constitute "good cause" for Plaintiff failure to present this evidence to the ALJ. *See Matthews*, 239 F.3d at 594-95 (citing *Szubak*, 745 F.2d at 833-34). Indeed, Plaintiff was treated by Dr. Bruno numerous times between 2004 and the date of her medical source statement. Dr. Bruno's medical source statement was based on her knowledge of Plaintiff's limitations after many years of treatment. As such, Plaintiff could have obtained said statement prior to the administrative hearing or the close of the record. *See Id.* (holding that, "[i]f we were to order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand").

Because Dr. Bruno's medical source statement is not material and because Plaintiff has failed to show good cause why the statement was not presented to the ALJ, we find that remand would be inappropriate based on said evidence. Plaintiff's motion for summary judgment on this issue will be denied.

2.

In regard to Plaintiff's argument that this case should be remanded because the ALJ erred in failing to hold a supplemental hearing, we find Plaintiff's argument to be without merit. Rather, we find that, to the extent that the ALJ was even required to hold a supplemental hearing, he did not err when he declined to do so.

According to its statement of purpose, the SSA's Hearings, Appeals and Litigation Law Manual ("HALLEX") is intended to convey "guiding principles, procedural guidance and information to the Office of Hearings and Appeals ("OHA") staff. ... It also defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council, and Civil Action levels." HALLEX §I-1-0-1, Purpose, http://www.socialsecurity.gov/OP_Home/hallex/I-01/I-1-0-1.html. HALLEX provisions are available at http://www.ssa.gov/OP_Home/hallex/. (Last visited December 4, 2009).

Section I-2-5-56 of HALLEX addresses "Obtaining Vocational Expert Opinion After the Hearing." It provides:

> Although these situations occur relatively infrequently, the ALJ may identify the need for VE evidence during or after the hearing. For example:
>
> • The claimant may submit evidence during or after the hearing which establishes the existence of another severe impairment which raises issues that require VE testimony for a determination at step 5 of the sequential evaluation process.
> • Evidence submitted after the hearing indicates that the claimant's functional limitations differ from those covered in the hypothetical questions to which the VE responded at the hearing.

HALLEX §I-2-5-56(A), Obtaining Vocational Expert Opinion After the Hearing, found at

http://www.socialsecurity.gov/OP_Home/hallex/I-02/I-2-5-56.html (Last visited December 4, 2009).

The United States Court of Appeals for the Third Circuit has held that manuals promulgating official Social Security policy and operating instructions, such as HALLEX, "do not have the force of law." *See Edelman v. Commissioner of Social Security*, 83 F.3d 68, 71 n. 2 (3d Cir. 1996) (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)). *See also Bordes v. Commissioner of Social Security*, 235 Fed. Appx. 853, 859 (3d Cir. 2007) (citing *Hansen*, 450 U.S. at 789; *Binder & Binder, P.C. v. Barnhart*, 481 F.3d 141, 151 (2d Cir. 2007); *Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir. 2003); and *Tejada v. Apfel*, 167 F.3d 770, 775 (2d Cir. 1999)) (holding that HALLEX provisions "lack the force of law and create no judicially enforceable rights"). In *Bordes v. Commissioner of Social Security*, the Court of Appeals held in a non-precedential opinion that the claimant's argument that the Appeals Council's actions did not comply with HALLEX and were fundamentally unfair were without merit. *Id.* at 858. In addition to holding that HALLEX does not create judicially enforceable rights, the Court also noted that the United States Court of Appeals for the Fifth Circuit has taken a different approach regarding the enforceability of HALLEX policies and procedures on judicial review. *Id.* at 859. Specifically, the Court noted that the Court of Appeals for the Fifth Circuit has held that if prejudice to the claimant results from a violation of HALLEX policies and procedures, the determination "can not stand," and thus in some circumstances the Court could remand as a result of the ALJ's failure to adhere to HALLEX's guidelines. *Id.* (quoting *Newton v. Apfel*, 209 F.3d 338, 359-60 (5th Cir. 1981)). While it did not adopt the Fifth Circuit's analysis, the Court of Appeals in *Bordes* nonetheless held that, even under the Fifth Circuit's approach, the claimant had not shown that it was prejudiced by the Appeals Council's failure to comply with its own policies and was therefore not entitled to reversal or remand. *Id.*

In this case, Plaintiff's hearing before the ALJ was held on October 10, 2007. (R. at 13; 25-27). The ALJ issued his decision denying Plaintiff's SSI claim on December 19, 2007. (R. at 22). Dr. Bruno provided the records of the medical source statement done on October 19, 2007 to Plaintiff's counsel on December 26, 2007. (R. at 435). In turn, plaintiff's counsel provided the medical source statement to the ALJ on January 8, 2008. (R. at 439).

Here, we find the Court of Appeal's holding in *Bordes* to be persuasive. First, we cannot hold that HALLEX *required* the ALJ in this case to conduct a supplemental hearing after Plaintiff submitted the medical source statement from Dr. Bruno, particularly considering the fact that Plaintiff did not submit said evidence until after the ALJ had rendered his decision. Rather, HALLEX directs that, in the rare case that an ALJ obtains evidence that indicates that a claimant's functional limitations are different from those referenced in the hypothetical question directed to the vocational expert at the administrative hearing, the ALJ may hold a supplemental hearing or obtain further testimony from the vocational expert by the "most appropriate method ... consistent with the claimant's rights with respect to posthearing evidence." HALLEX §I-1-5-56(B). It does not establish a right to a supplemental hearing when the claimant introduces evidence to the ALJ after a determination has already been rendered. Nor does the Social Security Act necessitate remand for an ALJ's failure to conduct a supplemental hearing pursuant to this section of HALLEX. *See* 42 U.S.C. §405(g). Rather, §405(g) allows us to remand on the basis of evidence submitted after the ALJ has rendered a decision, provided that said evidence is new and material and the claimant has shown good cause for not providing the evidence to the ALJ. 42 U.S.C. §405(g). Assuming *arguendo* that the Court of Appeals would apply the Fifth Circuit's analysis to the instant case, we find that, regardless, Plaintiff has failed to show that she was prejudiced by the ALJ's failure to

22

conduct a supplemental hearing. Notably, the analysis for determining whether remand is appropriate based on new evidence, pursuant to §405(g) in this case applies to the question of whether Plaintiff would suffer prejudice. Indeed, we find that Plaintiff would not suffer prejudice, insofar as the evidence in question is not new or material, as we discussed *supra*. Therefore, the ALJ's failure to hold a supplemental hearing to obtain vocational expert testimony based on said evidence is not an appropriate basis for remand. Further, in the Court's estimation, remanding the case to the ALJ for his failure to conduct a supplementary hearing would be a patent waste of judicial time and resources.

Additionally the Court notes that, in a social security case, the burden is on the claimant to prove disability. 42 U.S.C. §423(d)(1); *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988) (quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)). Plaintiff's argument that the ALJ was required to reopen the record for further development, after his determination and the introduction of Dr. Bruno's medical source statement is asking us to shift the burden to the Commissioner. *See Purnell v. Astrue*, — F.Supp. 2d — , 2009 WL 2616711 (E.D. Pa. 2009). It was Plaintiff's burden to present evidence of her disability to the ALJ at the administrative level and, as discussed above, she has not provided good cause for not submitting this evidence prior to the ALJ's determination. We therefore find that the ALJ did not err in failing to reopen the administrative record or to conduct a supplemental hearing.

B.      *Whether Substantial Evidence Supports the ALJ's Residual Functional Capacity Determination*

Plaintiff argues that the ALJ erred in determining that Plaintiff has the residual functional capacity to perform light or sedentary work. (Docket No. 9 at 12). Specifically, Plaintiff contends

23

that the ALJ failed to consider that, while she can sit without limitations, she is limited to standing

and walking less than one hour per day; and she is limited in her abilities to push, pull and perform

fine manual dexterity. *Id.* Therefore, Plaintiff argues, she is unable to perform work at the light

exertional level, as defined by 20 C.F.R. §404.1567. *Id.* Moreover, Plaintiff contends, "she is unable

to perform sedentary work activities given the extent of her physical limitations" as noted by her

examining and treating physicians. *Id.* We disagree and find that substantial evidence supports the

ALJ's residual functional capacity determination.

A claimant's residual functional capacity is defined as that which she is "'still able to do

despite the limitations caused by [her] impairment(s).'" *Fargnoli*, 247 F.3d at 40 (quoting *Burnett*

*v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000))(quotations omitted); 20

C.F.R. §404.1525(a)(1). In determining a claimant's residual functional capacity, the Commissioner

must consider all of her impairments, both severe and non-severe. 20 C.F.R. §404.1545(a)(2).

Additionally, the ALJ is required to consider all evidence of record in making a residual functional

capacity determination, including medical and non-medical evidence. *Burnett*, 220 F.3d at 121

(citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Doak v. Heckler*, 790 F.2d 26, 29 (3d

Cir. 1986)). *See also Fargnoli*, 247 F.3d 34, 41 (3d Cir. 2001) (holding that the Commissioner is

required to consider all record evidence, including "medical records, observations made during

formal medical examinations, descriptions of limitations by the claimant and others, and

observations of the claimant's limitations by others").

The ALJ determined that, considering Plaintiff's symptoms, the objective medical evidence,

and Plaintiff's subjective testimony, she has the residual functional capacity to perform light work

24

or sedentary work, with the additional limitations that she has only incidental ability[5] to climb, balance, bend, stoop, kneel, crouch, squat and crawl; Plaintiff must have a sit stand at will option; she is limited in her ability to push, pull and reach in her upper extremities to the point that has only incidental ability to perform fine manual dexterity fingering and pinching; she can never reach overhead or extend her arms forward in an unsupported manner; she must avoid all exposure to hazards such as unprotected heights and moving machinery; and she is restricted to work that involves simple, routine, repetitive tasks, but not any piece work production pace rate and with no interaction with the general public. (R. at 16-17).

"Light" work is work that involves:

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a fully or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §404.1567(b).

Here, we find that substantial evidence supports the ALJ's residual functional capacity determination. The ALJ considered all of the record medical evidence and gave significant weight to the records of Plaintiff's treating physicians, particularly Dr. Bruno, and appropriate weight to Dr. Kalata's assessment. Specifically, records from Dr. Bruno indicate that Plaintiff's diagnostic evaluations in regard to her ongoing pelvic and abdominal pain and numbness were generally benign (R. at 260-303). Likewise, Dr. Dexter examined Plaintiff in regard to her abdominal and pelvic pain

---

[5]

The ALJ defined incidental ability as totaling not more than 1/6 (approximately one hour and twenty minutes) of a routine 8-hour work shift. (R. at 16).

in 2005 and found no significant abnormalities. (R. at 268).

An MRI of the lumbar spine in March 2005 indicated a left paramedian disc protrusion, which deformed the left ventral contour of the thecal sac and displaced the S1 nerve root. (R. at 298). Plaintiff indicated to Dr. Bruno that her back pain felt a little better with the prescribed medications. (R. at 271).   An MRI of the cervical spine performed in August 2005 was negative. (R. at 297). Dr. Bruno referred Plaintiff to Dr. White, who indicated that he was unable to find any neurological deficits and could find no reason for Plaintiff's complaints of numbness, weakness and paralysis in her arm. (R. at 405).

Dr. Kalata's assessment indicated that Plaintiff's strength in her right arm was 5/5.  (R. at 251). His notes indicate that Plaintiff could not toe walk, heel walk or crouch. *Id.*  He likewise noted that Plaintiff's neck and low back area were tender. *Id.*  Plaintiff was able to get on and off the examining table normally.  She was not able to walk on her heels or squat. *Id.*  Dr. Kalata noted that Plaitniff's motor power was 5/5. Plaintiff was able to perform a straight leg raise. *Id.*

Considering the medical evidence of record, we find that substantial evidence supports the ALJ's determination that Plaintiff would be able to perform light work, with the additional limitations as stated by the ALJ or sedentary work.  Therefore, Plaintiff's motion for summary judgment as to this issue is also denied.

## VI. Conclusion

For the foregoing reasons, we conclude that there is substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted..

An appropriate order will be entered

By the court,

*Maurice B. Cohill, Jr.*

Maurice B. Cohill, Jr.
Senior United States District Judge

Dated: December 15, 2009

cc:     All counsel of record.